## IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. CR-16-237-D |
| | ) | |
| JOHN ARNOLD SHELLEY, | ) | |
| | ) | |
| Defendant. | ) | |

### FINDINGS AND CONCLUSIONS ON LOSS AMOUNT AND RESTITUTION

The following findings and conclusions regarding the amount of loss for purposes of calculating the advisory guideline range, and the appropriate amount of restitution, supplement the findings the Court will announce during the sentencing hearing. On the issues addressed herein, these findings are not intended to touch on every fact or all evidence relied on by the Court, but instead to address facts and evidence the Court considered particularly informative and persuasive. The overall findings and conclusions in this case are based on all the facts, evidence, and circumstances properly presented to the Court.

Pursuant to the Plea Agreement, Defendant pled guilty to a Superseding Information [Doc. No. 53], which charged him with making a false statement to the FDIC on July 30, 2013, in violation of 18 U.S.C. § 1007. Specifically, Defendant, in his capacity as President of The Bank of Union (the Bank), submitted a quarterly call report in which he falsely represented to the FDIC that the Bank had more than

$36 million in equity capital, knowing that the actual amount was significantly less.

In calculating loss under the guidelines, the Court is not limited to conduct underlying the offense of conviction, but rather may consider all of Defendant's relevant conduct. *See United States v. Griffith*, 584 F.3d 1004, 1011 (10th Cir. 2009); USSG § 1B1.3. The parties disagree on what relevant conduct may be attributed to Defendant for sentencing purposes. The United States bears the burden of proving loss by a preponderance of the evidence. *Id.* Pursuant to the Plea Agreement, the United States and Defendant have agreed that "any criminal conduct described in the Indictment ..., which the Court finds attributable to [Defendant] by a preponderance of the evidence, requires grouping with and is part of the same course of conduct as the offense of conviction under USSG § 1B1.3(a)(2)." [Doc. No. 57 at ¶ 7(3)]. Thus, the parties agree that the allegations in the Indictment constitute relevant conduct for sentencing to the extent the Court finds Defendant liable for such conduct.

The USSG define "relevant conduct," in pertinent part, as follows:

> (1)(A) all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant ... that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense;

> (2) solely with respect to offenses of a character for which § 3D1.2(d) would require grouping of multiple counts, all acts and omissions described ... above that were part of the same course of conduct or common scheme or plan as the offense of conviction;

> (3) all harm that resulted from the acts and omissions specified … above, and all harm that was the object of such acts and omissions; and

> (4) any other information specified in the applicable guideline.

USSG § 1B1.3(a). The Commentary also explains that "for two or more offenses to constitute part of a common scheme or plan, they must be substantially connected to each other by at least one common factor, such as common victims, common accomplices, common purpose, or similar modus operandi." USSG § 1B1.3, comment. (n. 5(B)(i)). "[I]f the conduct is sufficiently similar and within the same temporal proximity, it may be considered relevant for purposes of determining the guideline range." *United States v. Williams*, 292 F.3d 681, 685 (10th Cir. 2002) (*quoting United States v. McClelland*, 141 F.3d 967, 973 (10th Cir. 1998)).

"Relevant conduct under the Guidelines … 'comprises more, often much more, than the offense of conviction itself, and may include uncharged and even acquitted conduct.'" *Griffith*, 584 F.3d at 1012 (*quoting United States v. Altamirano-Quintero*, 511 F.3d 1087, 1095 (10th Cir. 2007) (internal quotations omitted)). "Nonetheless, relevant conduct 'still must relate to the offense of conviction.'" *Griffith*, 584 F.3d at 1012. In summary, the United States must prove by a preponderance of the evidence that Defendant (1) engaged in conduct (2) related to the offense of conviction pursuant to USSG § 1B1.3 which (3) constitutes a criminal offense under federal or state law. *Id.* at 1013.

**Headington Wire Fraud – Count 22 of the Indictment**

Count 22 alleged that Defendant for the purpose of executing a scheme to defraud in a material manner caused an interstate wire transfer in the amount of $40 million to be transferred from Tim Headington's Bank of America account in New York City to the Bankers Bank in Oklahoma City.

Where false representations are involved in the scheme, they must be material. *Neder v. United States*, 527 U.S. 1, 25 (1999). However, affirmative misrepresentations are not necessary. *United States v. Cochran*, 109 F.3d 660, 664 (10th Cir. 1997). A material omission will suffice. *Neder,* 527 U.S. at 24.

The Court finds that Defendant omitted material information about the Bank's financial condition when he asked Headington to invest $40 million in the Bank. Headington testified that his first conversation with Defendant about the $40 million occurred over the telephone on December 10, 2012. Raymond George Brisco, risk examiner for the FDIC, testified that he, Joe Normandin, and others met with Defendant on December 3, 2012. Government's Exhibit No. 37 details their conversation. According to the email, Brisco and Normandin met with Defendant on December 3, 2012. They provided Defendant with an interim downgrade letter and told Defendant that the regional office and the state banking department had concerns with the Bomhak relationship. Defendant was given one week to provide livestock inspection reports on the Bomhak cattle. Normandin asked Defendant if

he was "aware of the gravity of the situation" and suggested it was "a good time to notify Mr. Headington of the situation and that a capital injection of $40 to $50 million could be necessary." Gov't Ex. No. 37.

Headington testified that when he spoke with Defendant on December 10, 2012, Defendant did not tell Headington that the FDIC considered the Bank to be in a grave situation, nor did Defendant mention the contents of the December 3, 2012 email. Tr. at 65 [Doc. No. 98 at 65]. Headington testified that he "believed, based on what [Defendant] told [him], that it was not risky and that loans were current and that they were working as hard as they could to get their paperwork done to satisfy the FDIC." *Id.* at 59-60. Headington said this "made sense." *Id.* at 60.

To Headington's belief, up until 2012, the bank was making money and Headington's investment looked "very good." *Id.* at 9. In fact, the board meeting minutes for the Bank's holding company reflected that the Bank in October 2012 had more than $48 million in capital with a loan loss reserve of $6.5 million and total assets of $416 million. Tr. at 10 [Doc. No. 98 at 10]; Gov't Ex. No. 8.

Headington testified that he trusted Defendant; he "didn't have any reason not to trust [Defendant]." Tr. at 21 [Doc. No. 98 at 21]. They "were good friends [and] had a really good relationship." *Id.* Headington characterized his relationship with Defendant as a decades-long friendship that began in the ninth grade, continued

through college, and persisted throughout their adult life.  Headington even loaned Defendant the money for Defendant's fifteen percent share in the bank.  *Id.* at 35.

The parties disagree whether Headington's $40 million investment was a loan or a capital infusion.  Headington testified that Defendant asked for $40 million to "bridge" the paperwork problems until the end of the year, which would allow the FDIC examination to be completed.  *Id.* at 13.

Headington asked Defendant a couple of times if there was any risk involved, and Defendant said "no."  *Id.* Headington said Defendant "thought it would be relatively short-term, maybe two or three months" before Headington would get his money back.  *Id.* at 13-14.  Based on the evidence presented, the Court is satisfied that Defendant represented the $40 million as a loan and certainly that was Headington's expectation.  Further, Michael Tregoning, President of Headington Companies, testified that Headington expected the $40 million to be returned.  Tr. at 14 [Doc. No. 97 at 14].

Defendant's material omissions concerning the financial condition of the Bank continued at the December 18, 2012 meeting held at Headington's home.  Tregoning testified that characterizing the problem as growth and inadequate collateral documentation "fell far short of the full picture."  *Id*. at 48.  Either Defendant or Mr. Braun represented at this meeting that the Bank was not capitalizing interest on loans.  *Id.* at 13.  Had Tregoning known that Defendant was

capitalizing interest, he stated he would have advised against the investment because this would have been a red flag for poor quality loans. *Id.* at 15, 64-65. If borrowers cannot afford to pay interest, the loans would be at risk of default and would be difficult to sell. *Id.* at 13, 65. Government's Exhibit No. 33, which is the FDIC's Report of Examination for 2012 dated April 8, 2013, indicates on page 2 that management concealed performance weaknesses through liberal renewals/extensions of loans and capitalization of interest. Defendant in his conversations with Headington and Tregoning never mentioned the Bomhak loans, which had a book value of about $50 million and were delinquent.

The Court finds that the December 27, 2012 wire fraud forms part of the same course of conduct or common scheme or plan as the offense of conviction. In this regard, regularity and temporal proximity are the elements to be evaluated. *United States v. Caldwell*, 585 F.3d 1347, 1350 (10th Cir. 2009). Defendant continued to misrepresent or fail to disclose the true financial condition of the Bank from December 2012 through July 30, 2013, and after. He made misrepresentations and/or omissions to Headington, to the FDIC, and to the Bank's board of directors (BOD).

The evidence shows that Defendant was making misrepresentations to the BOD prior to December 2012. Board meeting minutes from June 2010 and October 2010 reflect that Defendant told the BOD he was going to cut funding to the

Bomhaks, but he did the opposite and increased funding. *See* Gov't Ex. Nos. 40, 42-44.

In an e-mail dated June 19, 2013, Defendant represented to Headington and Christopher Martin (Headington's nephew and investment manager at Headington Companies) that cattle sales were continuing, and the Bank was expecting a large pay down at the end of the week. Gov't Ex. No. 15; Tr. at 21-22 [Doc. No. 98 at 21-22]. The large promised pay down never happened. Tr. at 22 [Doc. No. 98 at 22]. In September 2013, after his false call report to the FDIC, Defendant suggested that Headington consider buying the Bomhak cattle loans. Tr. at 26-27. Defendant presented it to Headington as "a good opportunity." *Id.* Defendant represented that the loans were undervalued and in time would be good loans. *Id.* at 27.

In deciding that the December 27, 2012 wire fraud constitutes relevant conduct, the Court has considered all the evidence submitted, including the affidavits submitted by Defendant on the third day of sentencing proceedings. *See* Def.'s Ex. Nos. 129-131.

The Court has also considered the withdrawals by Headington and members of his family from the Bank in December 2012. *See* Gov't Ex. No. 24; Def.'s Ex. No. 131. Headington testified that he withdrew money from the Bank in December 2012 to use to help fund the $40 million investment. Tr. at 30-31 [Doc. No. 98 at 30-31]. Government's Ex. No. 24 shows that Headington withdrew $8,514.19 on

December 11; $2.8 million on December 14; $13,000 on December 14; and $4,133,255.53 and $10,081,111.10 on December 27, for a total of $17,035,880.82. Headington added that he sold some assets and used the fee he earned from the Tony Say loan to come up with the balance. Tr. at 31 [Doc. No. 98 at 31]. Government's Ex. No. 24 shows that Mr. Say wired more than $4.3 million on December 20 to Citrus Energy, which is consistent with Headington's testimony that Mr. Say's oil and gas loan was paid off. Tr. at 30 [Doc. No. 98 at 30]. The Court finds Headington's testimony on this subject, as well as his testimony generally, to be credible.

Christopher Martin was not asked during his testimony why he and other family members withdrew money from the Bank in December 2012. Headington testified that those withdrawals would have been Martin's decision. Tr. at 31 [Doc. No. 98 at 31]. There is no evidence of record that suggests that Headington or Martin knew of the true financial condition of the bank in December 2012. Martin credibly testified that he was not aware of any issues with the bank until March 2013 when Headington asked him to investigate his $40 million investment.

In summary, the United States has shown by a preponderance of the evidence that Defendant engaged in conduct related to the offense of conviction which constituted a criminal offense under federal law, i.e., wire fraud. Defendant caused Headington to make an interstate wire transfer on December 27, 2012. The wire

transfer was induced through false representations and material omissions by Defendant, as described above.

**The Bomhak Loans – Counts 18-21 and 23 of the Indictment**

The Court is not convinced that Defendant's fraudulent conduct began at the outset of the Bomhak relationship, or prior to 2010. Defendant likely initially believed that the Bomhak loans would be productive. Defendant's conduct, at first, was most likely the result of bad banking practices. He did not pay attention to assets; he did not get inspection or inventory reports; and he issued questionable loans. As many of the borrowers struggled, Defendant began capitalizing interest. However, the Court is also not convinced that Defendant, as he asserts, was unaware of the Bomhaks' financial deficiencies until March 2013. Defendant's bad business practices became fraudulent when he began concealing overdrafts from the BOD. The evidence of record establishes that this was occurring as early as June 2011.

In February 2011, the Bank's lending policy, which is set out in Government's Exhibit No. 50, instructed that account overdrafts should not generally be granted when a borrower's loan was more than 30 days past due. Gov't Ex. No. 50 at 5; [Doc. No. 1 at ¶ 29]. The policy also required overdrafts exceeding $5,000.00 to receive two levels of approval. Gov't Ex. No. 50 at 4; [Doc. No. 1 at ¶ 29]. As part of his investigation, FDIC Special Agent Steve Overby compared the Bank's daily

overdraft reports with the monthly reports that were shown to the BOD. *See* Gov't Ex. Nos. 65, 66.

The BOD only reviewed accounts that were overdrawn for 30 consecutive days. According to Overby, the BOD did not find out Defendant was capitalizing interest until 2013. Kirstein Haydon confirmed that Defendant "usually always covered the [Bomhaks'] overdraft[s] at the end of the month." Tr. at 12 [Doc. No. 100 at 12]. She suspected this "was for the monthly board reports." *Id.* She was never off the last day of the month because there was always work to be done on that day. *Id*. at 12-13. She had to prepare loans, and these loans included those to cover overdrafts. *Id*. at 13. She also testified that Terry and Cody Bomhak were at the Bank "most every day" and that they met with Defendant almost every time they were in the Bank. *Id.* at 7.

Haydon testified that the Bank required dual approval before a borrowing customer's overdraft of $5,000.00 or more could be approved; however, Defendant approved overdrafts without the concurrence of a second bank officer. Tr. at 29 [Doc. No. 100 at 29]. FDIC Investigative Specialist Bobby Joe Hood's report also reflects that Defendant admitted he was responsible for the Bomhaks' overdrafts, and that he did not get concurrence from anyone else to approve the overdrafts. Gov't Ex. No. 40 at 13.

Count 18 of the Indictment charged Defendant with misapplication of bank funds in violation of 18 U.S.C. § 656. [Doc. No. 1 at 16-17]. On June 27, 2011, a preliminary overdraft report showed that Cody Bomhak's Account Number 0316 was overdrawn by $769,016.26 and had been overdrawn for 49 consecutive days. Gov't Ex. No. 52 at 3. Cody Bomhak's Trucking Account Number 2682 was overdrawn on that same date by $181,934.11 and had been overdrawn for 53 consecutive days. *Id.* at 4. On June 30, 2011, Defendant issued two loans to Cody Bomhak and deposited the proceeds from those loans in Account Nos. 0316 and 2682 to cover the overdrafts. Gov't Ex. No. 40 at 12, 16.

Count 19 of the Indictment charged Defendant with making a false bank entry in violation of 18 U.S.C. § 1005. [Doc. No. 1 at ¶ 35]. Specifically, Defendant presented an overdraft report to the BOD on June 30, 2011, which showed accounts that had been overdrawn for 30 consecutive days; however, he omitted Account Nos. 0316 and 2682 for Cody Bomhak, knowing those accounts had been overdrawn for more than 30 consecutive days. *See* Hood's Report [Gov't Ex. No. 40 at 16]; Overby's Chart [Gov't Ex. No. 65.].

Count 20 of the Indictment charged Defendant with misapplication of bank funds. [Doc. No. 1 at 18-19]. On August 29, 2011, a preliminary overdraft report showed that Cody Bomhak's Account Number 0316 was overdrawn by $1,186,746.61 and had been overdrawn for 40 consecutive days. Gov't Ex. No. 40

at 17. Cody Bomhak's Trucking Account Number 2682 was overdrawn on that same date by $209,670.79 and had been overdrawn for 41 consecutive days. *Id.* On August 30, 2011, Defendant issued two loans to Cody Bomhak and deposited the proceeds from those loans in Account Nos. 0316 and 2682 to cover the overdrafts. *Id.* at 12, 17.

Count 21 charged Defendant with presenting to the BOD a false overdraft report on August 31, 2011. [Doc. No. 1 at 19-20]. Specifically, Defendant presented an overdraft report to the BOD on August 31, 2011, which showed accounts that had been overdrawn for 30 consecutive days; however, he omitted Account Nos. 0316 and 2682 for Cody Bomhak, knowing those accounts had been overdrawn for more than 30 consecutive days. *See* Hood's Report [Gov't Ex. No. 40 at 17]; Overby's Chart [Gov't Ex. No. 65].

In 2011, the Bomhaks collectively were overdrawn more than $7.3 million, but only $269,397.67 was shown to the BOD. Gov't Ex. No. 65. In 2012, the Bomhaks were overdrawn more than $6.5 million, but only $880,046.42 was shown to the BOD. Gov't Ex. No. 66. The BOD did not know that the Bomhaks were severely overdrawn each month primarily because Defendant would issue the Bomhaks new loans at the end of the month to cover overdrafts.

Defendant was the loan officer for several large credits, including the Bomhak family, who according to Mr. Hood were the Bank's largest borrowers.[1]  Gov't Ex. No. 40 at 1.  Mr. Hood's civil investigation of the Bank began in October 2013.  He testified that he was on site at the Bank for three weeks.  As part of his investigation, he reviewed the meeting minutes of the BOD and traced loan proceeds.  His focus was the overdraft problem with the Bomhaks.

According to Mr. Hood, Defendant originated more than 130 loans to members of the Bomhak family from February 3, 2011 through November 15, 2012.  Gov't Ex. No. 40 at 1.  The Bomhaks' total outstanding debt reached about $52 million in November 2012.  *Id*.  Defendant also originated 12 loans for John Haffner.  *Id*.  Hood's investigation revealed that the Haffner loans were actually nominee or straw loans for Terry Bomhak.  *Id*.   Terry Bomhak made all of the payments on the Haffner loans and received all of the loan proceeds.  *Id*.  Loan proceeds, for the most part, were used to make payments on existing debt and cover massive overdrafts in Terry and Cody's cattle and trucking accounts.  *Id*.  Defendant was originating nominee loans for the benefit of the Bomhaks to mask legal lending limit violations.  *Id*. at 2.

---

[1] The 2012 FDIC Report of Examination indicates that of the 58 loan relationships that were adversely classified or listed as Special Mention, Defendant was the originating officer on 14 relationships, which comprised 73 percent of the total dollar amount of criticized loans.  Gov't Ex. No. 33 at 3.

In addition to the Haffner nominee loans, nominee loans were also made in Gary Bomhak's name. *Id.* at 2, 4. Gary is Terry's brother. *Id.* at 4. Haydon also testified that she suspected Terry was at his legal lending limit because Defendant had her transfer Gary's loan proceeds to Terry's account immediately upon issuance to cover Terry's overdrawn account. Tr. at 11 [Doc. No. 100 at 11].

From January 2011 through November 2012, Defendant originated 60 loans to Terry Bomhak. As of October 17, 2013, 37 of the 60 loans remained open with a balance of more than $26 million. Gov't Ex. 40 at 9-10. During that same time period, Defendant originated 56 loans to Cody Bomhak. As of October 17, 2013, 29 of the 56 loans remained open with a balance of more than $20 million. *Id.* at 11. Although the stated purpose of the loans was to purchase cattle, the proceeds were substantially used to cover overdrafts, refinance prior loans, and pay capitalized interest.

The 2012 FDIC Report of Examination also provides further support that Defendant knew the Bomhaks did not have the collateral to support their loans long before March 2013. Although the report (Gov't Ex. No 33) was not prepared until April 8, 2013, Raymond George Brisco, risk examiner for the FDIC, testified that the findings of the examination were communicated to Defendant while the FDIC

was on site at the Bank during the nine-week examination[2], which began on October 29, 2012.

The 2012 FDIC Report of Examination at Page 50 stated:

> Serious concern has arisen regarding the administration of the entire [Bomhak] relationship, with regard to: cattle inspections, financial reporting, approval authority, capitalization of interest, and legal lending limit violations. Initially, the cattle inspections on file were questionable as to independence and reliability. The reports were presented on bank letterhead, had very sparse information, little to no source/back-up data and were signed by [Defendant] and the borrowers. While [Defendant] claimed that the inspections were performed by a cattle inspector by the name of Bob Cowling, there was no evidence to that effect in the file. It was then learned that Mr. Cowling is a borrowing customer of the bank with personal debts exceeding $425M.[3]

---

[2] Brisco testified that a typical FDIC annual examination lasts about two weeks. Part of the reason this examination lasted nine weeks was to give Defendant sufficient time to validate the collateral that was lacking documentation in the files and to provide better financial statements.

[3] Special Agent Steve Overby testified that he interviewed Mr. Cowling. Cowling told him that Defendant asked him to prepare the cattle inspection reports based on cattle counts provided by Terry and Cody Bomhak. Cowling said Defendant knew he was not a licensed cattle inspector, but that he did not care because he needed it done. Mr. Cowling also indicated that Defendant was his loan officer and that Defendant would take care of him anytime he needed a loan. Overby also interviewed Jim Deberry, who reviewed cattle inspection reports at Terry Bomhak's request. Mr. Deberry was not a licensed cattle inspector. Government's Ex. No. 61 shows that more than $165,000 was paid on Mr. Deberry's loan with the Bank from a loan that was issued by the Bank to Cody Bomhak. Government's Ex. No. 62 shows that a loan was issued to Terry Bomhak by the Bank for the benefit of Mr. Deberry in the amount of $126,197.33. Defendant was the loan officer on both.

Gov't Ex. No. 33 at 50. The Report noted numerous instances of capitalized interest. *Id.* at 51. Total capitalized interest for 2012 for Terry Bomhak exceeded $538,000. *Id.* Defendant acknowledged during the 2012 examination that capitalizing interest dilutes the collateral base by increasing the debt without adding assets. *Id.*

The Report also noted violations of Section 802 of Article VIII of Oklahoma Banking Code. Although none of the Bomhaks on their own exceeded the legal lending limit, the FDIC found that the Bomhaks and their respective trucking companies met the common enterprise definition, and an apparent legal lending limit violation was cited. *Id.* at 16-17, 51. According to the Report, all of these concerns were communicated at various times throughout the examination to Defendant; Defendant acknowledged the issues and the potential weaknesses posed by the Bomhaks' credit relationship. *Id.* at 51. The Bomhak relationship was classified in the Report as "Special Mention," and Defendant did not disagree. *Id.*

Defendant continued to conceal the Bomhaks' overdrafts from the BOD in 2012 by issuing new loans at the end of the month and capitalizing interest. Further, Defendant continued to mislead the FDIC and the BOD by representing that he was not capitalizing interest. According to Overby, the BOD grew suspicious in 2012, but Defendant continued to assure them that the Bomhak loans were in good shape and that the Bomhaks were continuing to pay down their loans. Overby testified that

if the BOD had known Defendant was concealing the Bomhaks' overdrafts and capitalizing interest, they would have called the loans.

On October 30, 2012, Defendant originated Loan Number 103541 in the amount of $3,903,335.43 to Terry Bomhak and used the new loan proceeds to pay off Loan Number 103205 for $3,084,648.62 and Loan Number 102083 for $490,486.81. *See* Gov't Ex. No. 67; *see also* Hood's Report [Gov't Ex. No. 40 at 11]. At that time, $41,447.38 in interest was due on Loan Number 103205. Gov't Ex. No. 67 (Bate Stamp 000165). And, $28,286.81 in interest was due on Loan Number 102083. Gov't Ex. No. 67 (Bate Stamp 000166). That interest was not collected, but instead was capitalized into Loan Number 103541. *Id.*

Defendant also concealed the fact that he was capitalizing interest on the Bomhak loans in the 2013 FDIC questionnaire (Gov't Ex. No. 68) as alleged in Count 23 of the Indictment. The FDIC questionnaire covered the time period of September 2012 through September 2013. On Page 151 of Government's Ex. No. 68, the first question required Defendant to list all extensions of credits and corresponding balances which were renewed or extended without full collection of interest due and to list loans where interest had been capitalized. Defendant wrote "NONE." As reported by Overby, this was not true. Overby testified Defendant should have listed the accounts he was capitalizing interest on, including the Bomhak loans.

The Court finds that the misapplication of bank funds, false bank entries, and false statement to the FDIC described in Counts 18-21 and 23 of the Indictment form part of the same course of conduct or scheme as the offense of conviction. Defendant continued to misrepresent and/or conceal the true financial condition of the Bank to the BOD and the FDIC from June 2011 through September 2013. He generated new loans to cover the Bomhaks' overdrafts and rolled unpaid interest into the new loans. He concealed this from the BOD, and he lied to the FDIC when he represented that he was not capitalizing interest. Thus, Defendant should be held accountable for the Bank's loss, and thus the FDIC's loss, on the Bomhak loans.

**Juston Tech Loans – Counts 2 and 11 of the Indictment**

Counts 2 and 11 of the Indictment encompass the Juston Tech relationship. Defendant is charged in Count 2 with committing bank fraud on February 2, 2010, in violation of 18 U.S.C. § 1344. Specifically, Count 2 alleged that Defendant fraudulently obtained the Bank's money by causing the Bank to issue Loan Number 97668 to Tech in the amount of $3,053,486.22, knowing at the time that Tech did not in fact own some of the items listed as collateral. [Doc. No. 1 at ¶ 16]. Count 11 charged Defendant with making a false statement in connection with the Tech loan application on February 2, 2010. *Id.* at ¶ 22.

Government's Exhibit No. 76 shows that Defendant issued Tech a loan (Loan No. 97668) on February 2, 2010, in the amount of $3,053,486.22. This exhibit

includes a list of collateral that is signed by Tech and notarized by Haydon on March 12, 2010. The Court, however, is not satisfied that the United States has presented sufficient evidence to show that Defendant knew on February 2, 2010, that Tech did not have all the listed collateral.

Counts 2 and 11 require proof by a preponderance of the evidence that Defendant knew the statement was false when he made it. Although Ms. Haydon testified that Mr. Tech told her he no longer had some of the items, she did not tell Defendant this nor did she remove the items from the list. Tr. at 31-32 [Doc. No. 100 at 31-32]. Simply put, there was no evidence presented that Defendant knew the collateral list was inaccurate on February 2, 2010, when he issued the loan to Tech.

## The Van Horn Loans

FBI Agent Justin Lowrance testified that he interviewed Ms. Van Horn and that she did not implicate Defendant in her scheme. Thus, the Court finds the United States has not proven by a preponderance of the evidence that this loss is attributable to Defendant. Therefore, it will not be included as relevant conduct for purposes of the loss calculation.

## Guideline Calculation – Loss Amount

The loss amount for Headington is straightforward. He issued a one-time payment of $40,000,000.00 to the Bank, and the entire amount was lost when the Bank failed.

The United States has posited two alternatives for calculating the FDIC's loss. The more conservative estimate is to subtract the amount the FDIC realized from the sale of the outstanding loans from the book value of the loans. The book value does not include any interest accrued post-closing of the loan. [Doc. No. 92 at ¶ 5]. This figure for the Bomhak loans totals $45,275,274.67. [Doc. No. 92-2 at 9]; [Doc. No. 84-45 at 4]. Thus, the total loss amount for guideline purposes is $85,275,274.67, which results in a 24-level enhancement of the base offense level of 7. Other findings on additional objections affecting the guideline calculation will be announced in open court.

## Restitution

The provisions of the Mandatory Victim Restitution Act of 1996 apply to this offense. The FDIC, as receiver, is entitled to recover restitution for any loss suffered by the Bank due to Defendant's criminal conduct. Unlike the guideline loss calculation, interest can be included in restitution.

The Court incorporates all of its previous findings with respect to Defendant's conduct. Defendant was the loan officer for several large credits, including the

Bomhak family, the Bank's largest borrowers. In fact, of the 58 loan relationships adversely classified or listed as Special Mention in the 2012 FDIC exam report, Defendant was the originating officer on 14 relationships, comprising 73 percent of the total dollar amount of criticized loans. Gov't Ex. No. 33 at 3. For these reasons, the Court finds that Defendant's conduct substantially led to the failure of the Bank, and thus Defendant is responsible for restitution in the full amount of the loss to the FDIC. In a Stipulation dated October 24, 2018, the parties agreed that the full loss amount to the FDIC is $97,384,291.00. [Doc. No. 92 at ¶ 3]. The restitution owed to Mr. Headington is $40,000,000.00.

Dated: December 14, 2018

TIMOTHY D. DeGIUSTI
UNITED STATES DISTRICT JUDGE